FILED

2006 Sep-12  PM 02:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **PROGRESS CENTER-565, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FHS INVESTMENTS, LLC,** | ) | |
| | ) | |
| **Defendant, Counterclaimant,** | ) | |
| **and Third-Party Plaintiff,** | ) | **Civil Action No. CV 04-S-1274-NE** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **MARCUS & MILLICHAP** | ) | |
| **INCORPORATED OF ATLANTA;** | ) | |
| **JOHN J. WISE; and MAX** | ) | |
| **AGRIPPA LUTHER, III,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

## MEMORANDUM OPINION

This case, originally filed as an interpleader action in the Circuit Court of Madison County, Alabama, but subsequently removed to this court on the basis of the parties' diversity of citizenship and the amount in controversy, *see* 28 U.S.C. § 1332(a)(1), now is before the court on motions for summary judgment filed by realigned-plaintiff, Progress Center-565, LLC ("Progress Center"), and third-party defendants Marcus & Millichap, Inc. of Atlanta ("Marcus & Millichap"), John J.

Wise, and Max Agrippa Luther, III.[1]  The moving parties seek summary judgment on all claims asserted against them by defendant, counterclaimant, and third-party plaintiff, FHS Investments, LLC ("FHS").[2]  Those claims include a "claim for fraudulent misrepresentation" against all parties; and, against only Progress Center, a "claim for  rescission of agreement," a "claim in the alternative for reformation of agreement and for equitable lien," and a "claim in the alternative for breach of contract."[3]  Additionally, Progress Center has moved for summary judgment on its own claims against FHS for breach of contract and a declaratory judgment prescribing Progress Center's entitlement to the interpled monies currently in the Clerk's registry.[4]  FHS has responded in opposition to each of the four motions.[5]

---

[1] Doc. no. 63 (Plaintiff Progress Center's Motion for Summary Judgment); doc. no. 70 (Third-Party Defendant Marcus & Millichap, Inc.'s and John Wise's Joint Motion for Summary Judgment); doc. no. 66 (Third-Party Defendant Max Agrippa Luther, III's Motion for Summary Judgment).

[2] Doc. no. 63; doc. no. 66; doc. no. 70.

[3] Doc. no. 20 (Defendant FHS's Amended Answer, Counterclaims, and Third-Party Complaint).

[4] Doc. no. 63.

[5] Doc. no. 74 (Defendant FHS's Response in Opposition to Progress Center's Motion for Summary Judgment; doc. no. 72 (Defendant FHS's Response in Opposition to Luther's Motion for Summary Judgment); doc. no. 81 (Defendant FHS's Response in Opposition to Marcus & Millichap and Wise's Motions for Summary Judgment).

## PART ONE

### *Summary Judgment Standard*

As is exemplified by the motions in this case, both claimants and defending parties may move for summary judgment under Federal Rules of Civil Procedure 56(a) and (b), respectively.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Likewise, "summary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (internal citations omitted).

In either situation, the relevant question is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat

summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). *See also Anderson*, 477

U.S. at 251-52 (asking "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law").

## PART TWO

### *Summary of Relevant Facts*

This action concerns a dispute over a failed real estate transaction dating back to the Spring of 2004. Had things gone as planned, on April 29, 2004, Progress Center, an Alabama-based firm, would have conveyed title to a commercial office building constructed on property located in Huntsville, Alabama, and known as "Progress Center No. 7," to the California-based FHS for the sum of $4,275,000.[6] One day before the scheduled closing date, however, FHS faxed a letter to Progress Center purporting to terminate the parties' contract on the generic ground that "the

---

[6] Doc. no. 65 (Plaintiff Progress Center's Evidentiary Submission in Support of Summary Judgment), Ex. A (Bill of Interpleader), ¶¶ 5-6; *id*. at Ex. B (Purchase and Sale Agreement), § 2.

purchase of the Property is not in Buyer's best interest."[7]  Throughout the course of the litigation that has followed, FHS has contended that its termination of the contract was precipitated by a series of material misrepresentations concerning the rental value of the office building it was poised to purchase, each of which allegedly justified rescission.[8]

## A.     The Structure of the Transaction

Because FHS intended to lease office space within Progress Center No. 7 to commercial tenants, as Progress Center itself was doing, FHS was concerned with obtaining a building that would support "market rents":  that is, rental rates commensurate with the prevailing rent for commercial office space in similar buildings in the same market area.[9]  Of course, market rental rates also are relevant to a determination of the fair market value of the property itself on the open market.[10] Presumably to allow FHS time for an assessment of the building's rental value and inquiry into other issues related to the property, the "Purchase and Sale Agreement"

---

[7] *Id*. at Ex. C (Termination Letter from FHS).

[8] *See* doc. no. 70, Ex. A (Deposition of Mark Simens), p. 109, lines 1-13; doc. no. 20, p. 7, ¶ 19; doc. no. 75 (Defendant FHS's Memorandum in Opposition to Progress Center's Motion for Summary Judgment), p. 2, ¶ 10.

[9] *See* doc. no. 83 (Defendant FHS's Evidentiary Submission in Opposition to Marcus & Millichap's and John Wise's Motions for Summary Judgment), Ex. C (Deposition of Mark Simens), p. 212, lines 8-10.

[10] *See id*.

that FHS and Progress Center executed on February 17, 2004 did not immediately

obligate FHS to close on the proposed sale.[11]  Instead, the contract provided for a set

of two deposits and a thirty-day "due diligence period," beginning on February 17,

2004, and ending at Midnight on March 17, 2004, during which time FHS could

terminate the agreement with impunity.[12]  The relevant clause reads as follows:

> Notwithstanding anything in this Agreement to the contrary, [FHS] shall
> have the right, in [FHS's] sole and absolute discretion, to terminate this
> Agreement *for any reason or for no reason at any time prior to the end
> of the Due Diligence Period* by providing written notice thereof to
> [Progress Center] and to [First American] Title Company.  If [FHS]
> notifies [Progress Center] and Title Company prior to the expiration of
> the Due Diligence Period that [FHS] is disapproving any of Purchaser's
> Conditions Precedent [described elsewhere] . . . this Agreement
> automatically shall terminate *and the Initial Deposit shall be returned*
> to [FHS].[13]

The term "Initial Deposit" referenced in the preceding provision was set by the

agreement at $50,000; and, in accordance with the terms of the writing, FHS paid that

amount to the appointed escrow agent, First American Title Insurance Company

("First American"), on February 19, 2004.[14]

The purchase agreement also called for an "Additional Deposit," in the greater

---

[11] Doc. no. 65, Ex. B, § 4.

[12] *Id*. at Ex. A, ¶¶ 6-7.

[13] *Id*. at Ex. B, § 4 (emphasis supplied).

[14] *Id*. at Ex. A, ¶ 9; *id*. at Ex. B, § 3.

amount of $150,000, to be delivered to First American by the close of the thirty-day due diligence period.[15]  Unlike the initial deposit, however, which was refundable in full if FHS canceled the agreement within the due diligence period, the effect of tendering the second deposit, and going forward with the sale beyond the end of the due diligence period, was to render the contract binding — or, in real estate parlance, to allow it to "go hard."[16]  After that point, the purchase agreement recited that a default by FHS that caused the cancellation of the proposed transaction would entitle Progress Center to retain the $200,000 sum of the initial and additional deposits as liquidated damages.[17]

Thus, although in the end FHS did tender the $150,000 additional deposit to First American,[18] FHS now contends that it was fraudulently induced to do so by several alleged misrepresentations made by or on behalf of Progress Center.  FHS also claims Progress Center breached the purchase agreement by refusing to allow FHS to directly communicate with tenants of Progress Center No. 7.

---

[15] *Id*. at Ex. A, ¶ 9; *id*. at Ex. B, § 3.

[16] Doc. no. 64 (Plaintiff's Brief in Support of Motion for Summary Judgment), § I, ¶ 8; doc. no. 75 (Defendant FHS's Brief in Opposition to Plaintiff's Motion for Summary Judgment), § I, ¶ 8.

[17]Doc. no. 65, Ex. B, § 14(a).  The provision states that Progress Center is entitled to the "Deposit" in case of FHS's default.  The Agreement defines "Deposit" as the "Initial Deposit and the Additional Deposit . . . collectively . . . ."  *Id.*, § 3.

[18] *Id*. at Ex. A, ¶ 9; *id*. at Ex. J (Deposition of Mark Simens), p. 143, lines 6-18.

**B.     Due Diligence Provisions**

The purchase agreement contained a variety of features designed to facilitate FHS's due diligence inquiry.   Two clauses, each cast in very similar language, obligated Progress Center to afford FHS agents and representatives access to Progress Center No. 7 for the purpose of conducting inspections.   The first clause is located in that portion of the agreement captioned "Purchaser's Conditions to Closing," and reads as follows:

> During the Due Diligence Period, Seller shall afford authorized representatives of Purchaser reasonable access to the Property for the purpose of conducting such investigations and inspections of the Property as Purchaser deems appropriate; provided, however, that Purchaser shall not unreasonably interfere with any tenants [*sic*] use of the Property.[19]

A similar clause, appearing under the section entitled "Seller's Additional Covenants," required Progress Center to

> permit (and arrange for each tenant under the Leases to permit) the Purchaser and its agents and representatives to have access to the Property during reasonable business hours in order to conduct the investigations Purchaser deems pertinent to the Purchaser's acquisition of the Property.[20]

In addition to physical access, special attention was given to FHS's need to

---

[19] *Id*. at Ex. B, §  5(c).

[20] *Id*. at § 13(b).

know the terms of the leases in effect at the time between Progress Center and its commercial tenants.  The first section of the agreement, denominated "Property Included in Sale," makes plain that the existing lease agreements were intended to survive the consummation of the sale by listing among the property rights to be conveyed to FHS the "Seller's right, title and interest in and to the leases . . . all of which Leases are listed on Exhibit B attached hereto and incorporated herein by this reference."[21]  A companion provision, located under the "Purchaser's Conditions to Closing" heading, calls for FHS's "review and approval, within the Due Diligence Period, of the Leases."[22]  That same section also embraces a stipulation that FHS would be allowed to review and approve "the other Due Diligence Documents specified in Exhibit C" during the due diligence period.[23]  Exhibit C, which was appended to the agreement, included "[a]ny other contract, correspondence, documents and/or instruments materially affecting the Property and the ownership, use, occupancy and/or operation thereof," and

> [a] rent roll certified by the Seller as true, complete and correct in all material respects, setting forth a schedule of all tenants leasing space at the Property, the square footage covered by each Lease, the base rent and additional rent under each Lease . . . and the expiration date, term

---

[21] *Id*. at § 1(e) (emphasis deleted).

[22] *Id*. at § 5(d).

[23] *Id*. at § 5(e) (emphasis deleted).

and options to extend under each Lease.[24]

None of these provisions say, however, that Progress Center was obligated to perform FHS's investigation.  To the contrary, the purchase agreement specifically provided that "[t]he Due Diligence Materials will be provided to Purchaser without any representation or warranty of any kind or nature whatsoever and are merely provided to Purchaser for Purchaser's informational purposes."[25]  Moreover, the following language was included:

> PURCHASER AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, WITH RESPECT TO THE PROPERTY, PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER. PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS PURCHASER DEEMS NECESSARY . . . AND RELY UPON THE SAME. . . . EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY SELLER HEREIN, PURCHASER HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD[,] OR MAY HAVE AGAINST SELLER WITH RESPECT TO (i) THE DISCLAIMED MATTERS . . . AND (iv) ANY OTHER STATE OF FACTS THAT EXISTS WITH RESPECT TO THE PROPERTY.[26]

---

[24] *Id*. at Appended Ex. C (Due Diligence Documents), ¶¶ 4, 16.

[25] *Id*. at Ex. B, § 9(o).

[26] *Id*. (all-cap emphasis in original) (boldface emphasis deleted).

C.     **The Alleged Misrepresentations**[27]

FHS has vigorously argued that, because it intended to continue to operate

Progress Center No. 7 as a commercial office complex, the rental value of the leased

space was a critical consideration in determining whether to allow the contract to "go

hard."[28]  FHS also alleges that the rental value of the office space, insofar as it affects

the fair market value of the property, was material to its ability to obtain the purchase-

money financing it desired.[29]  According to the rent roll attached to the Purchase-Sale

Agreement as Exhibit B, Progress Center No. 7 housed four tenants on the date the

parties contracted for the sale, the most substantial of which was the United States

General Services Administration ("GSA").[30]  Rent at Progress Center No. 7 was

determined, at least in part, on the basis of the amount of space occupied by a

tenant.[31]  The rent roll indicates that GSA occupied 21,061 square feet during the

---

[27] Progress Center and the third-party defendants have all pointed out the fact that there is considerable inconsistency between the allegations of misrepresentations which appear in FHS's Amended Answer, Counterclaims, and Third-Party Complaint, on the one hand, and the allegations which have arisen in the course of discovery, on the other.  In order to paint a complete picture, this recitation of the facts includes *all* allegations, whenever made.  The legal ramifications are explained *infra*.

[28] *See*, *e.g.*, doc. no. 83, Ex. C, p. 212, lines 8-10.

[29] *Id.*

[30] Doc. no. 65, Ex. B, Appended Ex. B (List of Leases).  *See also* doc. no. 20, ¶ 6; doc. no. 50 (Plaintiff Progress Center's Answer to Amended Counterclaims), ¶ 6.

[31] Doc. no. 65, Ex. J, p. 161, lines 6-21 (explaining the role of amortization of the landlord's tenant investment expenditures in computing rent).

relevant time period, and was obligated to pay Progress Center $15.70 a square foot annually.[32]  Coming in a close second was an entity known as "Johann A. Krause, Inc.," which had agreed to pay $15.22 a square foot for 2,545 square feet of leased space.  FHS does not dispute the validity of any representations by Progress Center or its agents as to the amounts due under the *then-current* leases.  Instead, FHS's fraud claims stem from alleged misrepresentations regarding GSA's intentions (a) to renew its lease agreement and (b) expand the amount of space it rented, as well as (c) the market rental value of the property.[33]

### 1.    Market rental value

Before ever visiting Huntsville for a site inspection of Progress Center No. 7, FHS principal Mark Simens "had a question about the market rent."[34]  Specifically, Simens wanted to know whether market rent in the Huntsville area actually was $15.70 a square foot, "[b]ecause . . . in the documents [FHS] got, there was amortization of tenant improvements included in the fifteen-seventy."[35]  Simens

---

[32] The rent roll states that GSA's lease is due to expire on January 31, 2007.  *Id.* at Ex. B, Appended Ex. B.

[33] Doc. no. 20, p. 5, ¶¶ 7, 8, 10, 12.

[34] Doc. no. 83, Ex. C, p. 139, line 16.

[35] *Id.*, Ex. C, p. 140, line 20.  The court notes that, while Simens claimed that "the documents" he referred to were the due diligence documents provided to FHS pursuant to the purchase agreement, *see id.* at lines 23-24, there is strong evidence that he was confused as to this point.  In fact, an email from Marcus & Millichap agent Cooper Camak, which Simens' alleges came

-12-

contacted the listing broker on the property, Marcus & Millichap, Inc., an Atlanta-based firm that was representing Progress Center in its efforts to sell the building.[36] One of Marcus & Millichap's agents, Cooper Camak ("Camak"), responded by email, writing that

> $15.00 is right at the market rent rate for a full service lease in that area. That's from the Huntsville Chamber from their information. We think it might be outdated just a tad, but it's close.[37]

Subsequently, at some unspecified date during February 2004, Simens traveled to Huntsville for the site visit on behalf of FHS.[38]  While there, Simens principally interacted with Progress Center representative Max Agrippa Luther, III ("Luther"), Camak, and another of Marcus & Millichap's agents, John J. Wise ("Wise").[39] According to Simens, Luther twice represented that the rents at Progress Center No.

---

in response to his inquiry into market rent, is dated January 21, 2004, almost one month *before* the date on which the purchase agreement was executed.  *See* doc. no. 70, Ex. H (Cooper Camak Email).

[36] Doc. no. 65, Ex. J, p. 139, line 16.  *See also* doc. no. 83, Ex. C, p. 231, lines 18-23; doc. no. 70, Ex. B (Deposition of John Wise), p. 25, line 21 - p. 26, line 6.

[37] Doc. no. 70, Ex. H, ¶ 2 (boldface emphasis deleted).

[38] Doc. no. 83, Ex. C, p. 139, line 24 - p. 140, line 1.  Simens first testified that he could not recall whether his trip occurred before or after the execution of the purchase agreement, saying only "[i]t would normally be after the . . . execution."  *Id.* at lines 2-5.  He later testified that his trip was in fact subsequent to the execution of the agreement.  *Id.* at p. 144, line 23 - p. 145, line 2.  Luther reinforces Simens' testimony on this point, explaining that the site visit occurred "not too long after the purchase and sale agreement was fully executed."  Doc. no. 65, Ex. K, p. 204, line 23 - p. 205, line 5.

[39] Doc. no. 77 (Defendant FHS's Evidentiary Submission in Opposition to Progress Center's Motion for Summary Judgment), Ex. C (Deposition of Mark Simens), p. 145, lines 4-12.

7 were "market rents":  first during a meeting in Luther's office immediately prior to visiting the premises; and again during an automobile tour of the market area.[40] Significantly, FHS omitted any reference to this allegation in its Amended Answer, Counterclaims, and Third-Party Complaint,[41] but now points to Luther's deposition testimony as confirmation of Simens' account and the arguments in FHS's brief:

> Q.    Well, tell me what those statements were that Mark Simens made to you during the tour of Research Park.
>
> A.    He asked me about market rents.
>
> Q.    And what did he ask you about market rents?
>
> A.    I really can't recall specifically what he asked me or he asked — and I don't know whether he asked it to me, but he asked the car, the people traveling in the car.

---

[40] Simens testified as follows regarding Luther's representations:

> Q.    . . . What exactly did he represent to you?
>
> A.    He represented first of all at our meeting when we were in Huntsville that it [$15.70] was market rent.  And we went on a car ride with him and John Wise, different buildings which he pointed out which were supposedly comparable.  He repeatedly then on the phone after our due diligence period [stated] that it still was fifteen-seventy a foot.

*Id*. at p. 144, lines 10-17.  Asked if he considered Luther's representations concerning market rent to be statements of opinion, Simens replied in the affirmative, but declined an entreaty to declare market rent a wholly subjective concept.  *See* doc. no. 68 (Third-Party Defendant Luther's Evidentiary Submission in Support of Summary Judgment), Ex. J (Deposition of Mark Simens), p. 148, lines 2-11.

[41] *See* doc. no. 20, p. 5, ¶ 8 (alleging simply that "[d]uring the Due Diligence Period, [Luther] of Progress Center told Mark Simes [*sic*] of FHS that GSA intended to renew its lease and had agreed to do so at the rate of $15.70 per square foot").

. . .

Q.    Do you recall who responded to his question?

A.    I think we all responded to his question in some capacity.

Q.    Do you recall what you said to Mr. Simens?

A.    *I think Mr. Simens asked the question were the Progress Center rents market rents and we responded yes.*

Q.    . . . What did you mean by saying that the Progress Center, Number 7 rents were market rents?

A.    That there were comparable rates in the park to Progress Center 7.[42]

Simens and Luther also are in at least loose agreement regarding the statements made by Wise during an automobile tour of the market area. Luther testified:

I think John Wise and I both concurred with each other and agreed with each other. I can't remember who — whether I made the statement [concerning market rent] or John Wise made the statement. But we backed each other up on the statement . . . .[43]

Similarly, Simens recalled driving by various properties in the area and listening to Wise give "comparisons" of market rental rates for leased space in (and the fair

---

[42] Doc. no. 68, Ex. K (Deposition of Max Agrippa Luther, III), p. 221, line 15 - p. 222, line 23 (emphasis supplied).

[43] Doc. no. 83, Ex. D (Deposition of Max Agrippa Luther, III), p. 224, lines 3-8.

market value of) the properties.[44]   Simens stated, however, that on this occasion,

Camak made no representations.[45]

### 2.   Renewal and expansion of GSA's lease

In addition to the market rental value of the subject property, FHS was

interested in what arrangements, if any, Progress Center had made with its existing

tenants for future occupancy.[46]   In its Amended Answer, Counterclaims, and Third-

Party Complaint, FHS claims that Marcus & Millichap generally, and Wise and

Luther specifically, represented to Simens that GSA intended, and had agreed, to

*renew* its existing lease (as opposed to increasing or *expanding* the amount of space

_____

[44] Doc.  no. 70, Ex. A, p. 201, lines 18-20.    Interestingly, Simens turned down the opportunity to characterize Wise's statements as a "representation," testifying instead that [i]t's basically a comparison to . . . other properties in the market," *id*., even though he had testified just previously as follows:

Q.    ... Concerning the misrepresentations you contend — we'll take them both one at a time — John Wise made to you.

A.    He represented the market rate was $15.70 a foot.

Q.    When did he do that?

A.    In the car.  He was the driver of the car.

*Id*. at p. 200, lines 1-7.

[45] *Id*. at p. 202, lines 15-17.

[46] Doc. no. 65, Ex. J, p. 158, lines 7-12.

-16-

leased).[47]  Only two shards of evidence appear to develop this claim.  First, Scott Watts, an appraiser hired by FHS's financing company, testified that Luther assured him GSA "intended to *renew* at that higher rent."[48]  When pressed on the point, Watts continued to assert that Luther was referring to *renewal* of the existing GSA lease agreement, as opposed to an *expansion* of the space occupied by that agency.  On the other hand, Simens took a very different position, submitting that the presence of these allegations in the complaint may have been the result of either a miscommunication between lawyer and client, or a slip of the pen:

> Q.  So when you say Gripp [Luther] said that GSA intended to *renew its lease*, are you talking about the [contention that GSA intended to *expand into*, and *encompass*, the so-called] Krauses' space?

> A.  Yes.

> Q.  They [GSA] didn't have a lease on the Krauses' space, did they?

> A.  No; no.  That's a misstatement.

> . . .

> Q.  I just want to be clear, Mr. Simens.  You said the representation . . . you contend Gripp made was *not* that GSA was going to *renew its lease* in 2007; is that correct?

---

[47] Doc. no. 20, p. 5, ¶¶ 8, 10, 12.

[48] Doc. no. 77, Ex. E, p. 79, lines 2-7 (emphasis supplied).

A.      That's correct.[49]

However, Simens recalled a critical exchange concerning the status of the so-called "Krause space," and the intentions of both Krause and GSA with respect to renewal of their lease agreements.  Unlike GSA's lease, which was not due to expire until early 2007, Krause's lease was up for renewal on September 30, 2004.[50]  Simens testified that, while walking though the Krause space, Luther instructed him: "Don't say anything to the tenant.  They want to extend, but we're going to do a deal with GSA — [which] also wants the space."[51]  Simens followed up, asking "'[a]t the same rate as the other [referring to the rental rate then paid by GSA on its existing space]?'"[52]  Luther allegedly answered, "Yes."[53]  Again, the movants point out that FHS's counterclaims do not develop this alleged representation;[54] on the other hand, FHS argues that Luther's deposition testimony buttresses Simens' claims:

---

[49] Doc. no. 68, Ex. J, p. 159, lines 7-13; *id*. at p. 163, line 23 - p. 164, line 3 (emphasis and alterations added).

[50] Doc. no. 65, Ex. B, Appended Ex. B

[51] *Id*. at Ex. J, p. 159, lines 1-6.

[52] *Id*.

[53] *Id*.

[54] As mentioned above, the relevant portion of FHS's Counter-Complaint alleges only that "[d]uring the Due Diligence Period, [Luther] of Progress Center told Mark Simes [*sic*] of FHS that GSA intended to *renew* its lease and had *agreed* to do so at the rate of $15.70 per square foot."  Doc. no. 20, p. 5, ¶ 8.

Q.      And of what interest would *the GSA expansion* have been to
        Vince Schwab [another Marcus & Millichap broker], John Wise
        and Mark Simens?

A.      I had told all the parties that you just named that *it was my
        understanding* that GSA wanted to *expand into* the Krause space,
        that Krause wished – wanted to stay, but that I was going to let
        Krause go to make room for our primary tenant, GSA, to expand.

Q.      When you discussed this potential Krause expansion with these
        folks, did you discuss the leasing rate for the space?

A.      I could have.

Q.      Do you recall discussing the leasing rate with Vince Schwab,
        John Wise or Mark Simens for a prospective GSA expansion into
        this Krause space?

A.      I believe I told them that I would *forecast* or *predict* a rate that
        would be similar as to what they were currently paying.

Q.      And what was GSA paying in April of 2004?

                . . .

A.      According to this rent roll dated February the 13th, 2004, GSA
        was paying fifteen dollars and seventy cents a square foot.[55]

Simens' testimony underscores a crucial factor that otherwise may have been unclear:

that is, "[t]here was never any affirmation on [Luther's] part about extending both

leases.  He said, 'I will try.'  But there was not any guarantee or anything else about

---

[55] Doc. no. 77, Ex. D (Deposition of Max Agrippa Luther, III), p. 285, line 21 - p. 287, line
18 (emphasis supplied).

the extension."[56]

FHS also alleges that it requested direct contact with GSA in order to confirm GSA's lease and plans for the future.[57]  Progress Center, however, allegedly "refused to allow such contact and assured FHS that [it] would accurately provide FHS with any information that it needed to conduct its due diligence with respect to the Property."[58]  At any rate, Simens now concedes that Progress Center is correct in asserting that the contract authorized only physical access to the property, and not direct communications with the tenants.[59]  In fact, Simens, who was designated FHS's Federal Rule of Civil Procedure 30(b)(6) representative, testified as follows:

> Q.    . . . . Is there any section of this agreement that you contend my client [Progress Center] breached?
>
> A.    No.
>
> Q.    By you, I mean, FHS, obviously.
>
> A.    Yes.[60]

---

[56] Doc. no. 65, Ex. J, p. 158, lines 13-16.

[57] Doc. no. 20, p. 6, ¶ 14 (alleging); doc. no. 50, p. 2, ¶ 14 (denying).  *See also* doc. no. 76 (Defendant FHS's Evidentiary Submission in Opposition to Luther's Motion for Summary Judgment), Ex. A, ¶ 6; doc. no. 77, Ex. C, p. 114, lines 13-20.

[58] Doc. no. 20, p. 6, ¶14.  *See also* doc. no. 77, Ex. C, p. 114, lines 13-20 (alluding to the claim that "we weren't allowed to talk to GSA").

[59] *See* doc. no. 77, Ex. C, p. 114, lines 18-20; doc. no. 65, Ex. J, p. 69, lines 6-16.

[60] Doc. no. 65, Ex. J, p. 98, lines 17-21.

-20-

**D.      Financing Arrangements and the Appraisal**

While all of the above was transpiring, FHS was working with Greenwich

Capital Financial Products, Inc. ("Greenwich"), to obtain the necessary financing to

consummate its purchase.[61]  FHS had a history of dealing with Greenwich, and was

able to obtain a preliminary loan commitment based largely on the information

concerning market value that Simens received from Luther, Camak, and Wise.[62]

Greenwich, nonetheless, planned to undertake an independent appraisal of the

property; and, as mentioned above, retained Scott Watts to do so.[63]  In light of that

fact, Greenwich expressly made a final loan commitment contingent upon Watts

providing an estimate of market rental value that did not differ materially from

Progress Center's representations.[64]

Unfortunately for all involved, Watts did not complete his appraisal until after

---

[61] Doc. no. 77, Ex. C, p. 112, lines 2-18.

[62] *See id*. at p. 111, lines 12-18; *see also* doc. no. 83, Ex. C, p. 215, lines 12-21; *id.* at p. 139, lines 2-11.  Simens testified that he relied exclusively on the information from the seller.  *See id*. Asked if FHS did anything "to try and verify what the market rents were during the due diligence period," Simens responded, "in a small market that is like this where the seller had more expertise in the market rents than ourselves . . . we would rely on the representations that they told us."  Doc. no. 76, Ex. C, p. 150, lines 2-9.

[63] Doc. no. 77, Ex. C, lines 8-18

[64] *Id*. at p. 111, lines 12-18; doc. no. 83, Ex. C, p. 215, lines 12-21.

the expiration of the due diligence period.[65]  Simens explained the significance of the

delay:

> Q.    All things being equal, would you have rather had the appraisal
>        during the due diligence period?
>
> A.    Absolutely.
>
> Q.    Why is that?
>
> A.    Because this issue [the alleged misrepresentations] would have
>        come up in the due diligence period.
>
> Q.    Why would that have been important?
>
> A.    . . . Because we would have terminated the contract.  We wouldn't
>        be sitting here.
>
> Q.    Because there's a section in the purchase agreement that allows
>        you to terminate the contract during the due diligence period for
>        any reason; is that right?
>
> A.    That's correct.[66]

The reason FHS claims it would have exercised its right to preemptively

terminate the contract is that Watts' estimate of the building's market rental value

allegedly fell below $15.70 a square foot.  Just how much below is unclear, however,

because, in a stupefying bit of carelessness, FHS neglected to include in its

---

[65] Doc. no. 68, Ex. J, p. 132, lines 13-15.

[66] *Id.* at p. 132, line 18 - p. 133, line 8.

-22-

evidentiary submissions either a copy of the written appraisal or any testimony from Watts himself revealing his *actual estimate*.  Still, there is testimony (albeit mostly, if not entirely, hearsay) tending to support FHS' claim that the appraisal was lower than $15.70 a square foot.  Watts, for instance, testified as follows:

> Q.    Was there any discussion between you and Greenwich about how your appraisal was going to impact the loan Greenwich was purportedly making to FHS?
>
> A.    No.  They were just . . . concerned about my market rent estimate.
>
> . . .
>
> A.    . . . [A]fter I reported my market rent conclusion, I received a call from Gripp Luther and he thought my market rent estimates, as far as I can remember, was [*sic*] low.[67]

In addition, Simens relayed the following testimony:

> Q.    When you say it [Progress Center No. 7] did not appraise out, what does that mean?
>
> A.    It was worth substantially less than we were buying from . . . Progress Center.
>
> Q.    Well, tell me about your conversation with Watts. . . .
>
> A.    The conversation was that his preliminary findings was [*sic*] that this property is worth $3.6 million.  And therefore, we couldn't possibly get the loan that we were trying to get from Greenwich

---

[67] Doc. no. 77, Ex. E, p. 78, lines 13-20; *id*. at p. 80, lines 11-15.

Capital.[68]

He goes on:

> Q.    How much were you short?  In other words, based on the —
> Watts' preliminary appraisal, what did Greenwich . . . tell you [?]
>
> A.    Basically, the loan would be 75 percent loan devalued.  So it
> would have been . . .  three million six is what I was told versus
> the four million two, whatever it was.
>
> Q.    So how does that work out?
>
> A.    I think it's, like, $400,000 [short of the purchase price,
> discounting the sum of deposits already paid].[69]

Following the receipt of Watts' delinquent and deal-breaking appraisal,

Greenwich nevertheless agreed to finance FHS's acquisition of the property, but only

upon the condition that FHS received verification from GSA that it intended to

increase (expand) the size of its leased space at the same rate of $15.70 a square

foot.[70]  On April 28, 2004, however, one day before the scheduled closing date, FHS

received a forwarded email from Progress Center's attorney stating that GSA would

---

[68] *Id*. at Ex. C, p. 116, lines 6-16.

[69] Doc. no. 65, Ex. J, p. 129, lines 11-20.  Simens also noted that he personally felt that
market rent "would be $12 a foot" based on "[m]arket rents in the Huntsville area."  Doc. no. 77, Ex.
C, p. 155, lines 1-4.

[70] *See id*. at Ex. E, p. 79, lines 8-11.

-24-

not take over the Krause space.[71]  With all hopes of bringing up the market rental value of the property lost, Greenwich refused to assist defendant with financing.[72]

## E.    The Fallout

FHS was thus presented with a troublesome situation:  it had negotiated a contract that did not contain a contingency clause, stating that it could back-out of the contract if it failed to obtain a purchase-money loan commitment; it had relied on the seller's representations as to market value when tendering the aggregate sum of $200,000 in earnest money; and it had proceeded past the period during which it could disaffirm the contract for any reason — only to have its tentative loan commitment rescinded following a belated appraisal that contradicted the seller's representations.[73]  Perceiving no other favorable options, FHS informed Progress Center and First American on April 28, 2004, that it would not consummate the

---

[71] Doc. no. 83, Ex. C, p. 128, line 25 - p. 129, line 8; doc. no. 76, Ex. I (Email from Brian Flavell), p. 2; doc. no. 77, Ex. F, p. 133, lines 14-21.  In addition, Wise testified as follows:

Q.    . . . In actuality, isn't it true that at the end of the inspection period — as that term was used in the contract between FHS and Progress Center . . . GSA had not at that time agreed to lease the Krause space at $15.70 a foot, had it?

A.    No.  They had not.

*Id.*

[72] *See* doc. no. 65, Ex. J, p. 99, lines 6-13.

[73] *See* doc. no. 77, Ex. C, p. 151, lines 8-18; *see also id.* at p. 110, line 24 - p. 111, line 7.

transaction, and requested the return of its two deposits.[74]  Progress Center promptly

objected to FHS's request,[75] whereupon First American filed a Bill of Interpleader in

the Circuit Court for Madison County, Alabama.[76]  FHS subsequently removed the

action to this court, and the court ordered First American to place the disputed

deposits, plus accrued interest, in the Clerk's registry, dismissed First American as

a party to the action with prejudice, and realigned Progress Center and FHS to their

present status as plaintiff and defendant, respectively.[77]

Progress Center amended its claims against FHS on September 10, 2004, to

allege causes of action for breach of contract, misrepresentation, promissory fraud,

suppression, and slander of title.[78]  FHS filed counterclaims against Progress Center,

and later amended its filing to include as third-party defendants Luther, Wise, and

Marcus & Millichap.[79]   FHS asserts four claims in its Amended Answer,

Counterclaims, and Third-Party Complaint:   (1) a "claim for fraudulent

misrepresentation" against Progress Center, Luther, Wise, and Marcus & Millichap;

---

[74] *Id*. at Ex. C.

[75] *Id*. at Ex. D (Progress Center Objection).

[76] *Id*. at Ex. A.

[77] Doc. no. 1 (Notice of Removal); doc. no. 7 (Order Realigning Parties).

[78] Doc. no. 29 (Plaintiff Progress Center's Amendment to Claims Against FHS).

[79] Doc. no. 20.

(2) a "claim for rescission of agreement" against Progress Center; (3) a "claim in the alternative for reformation of agreement and equitable lien" against Progress Center; and (4) a "claim in the alternative for breach of contract" against Progress Center.[80]

Progress Center, Luther, Wise, and Marcus & Millichap have moved for summary judgment on all claims asserted against them by FHS, either by way of counterclaim or third-party complaint.[81]  Additionally, Progress Center has moved for summary judgment in its favor on its own claims for breach of contract, and, for a declaratory judgment determining whether Progress Center is entitled to the $200,000 sum deposited in the Clerk's registry.[82]  FHS has not moved for summary judgment, but has opposed each of the motions currently pending.

Although much of the evidence before the court concerns the alleged misrepresentations perpetrated by Progress Center and third-party defendants, a contract dispute lies at the heart of this action.  Progress Center seeks summary judgment on its claim for breach of contract against FHS, arguing essentially that FHS's failure to perform under the contract speaks for itself.

Moreover, Progress Center seeks summary judgment in its favor on the breach

---

[80] *Id.*

[81] Doc. no. 63; doc. no. 66; doc. no. 70.

[82] Doc. no. 63.  Progress Center has elected not to move for summary judgment on its claims for misrepresentation, suppression, promissory fraud, and slander of title.

of contract claims asserted against it by FHS.  The reasoning is straightforward:  in light of the fact that Simens *admitted* that Progress Center performed all of its obligations under the purchase agreement,[83] FHS's claim that Progress Center breached the contract is a *non sequitur.*  Perhaps recognizing the damage caused by Simens' admission, FHS devoted only a few sentences of its brief to the question of whether its breach of contract claim retains viability.[84]  This should be of some relief to third-party defendants Marcus & Millichap and Wise, as they have operated under the apparent misimpression that FHS has asserted breach of contract claims against *them* as well, and they have, accordingly, moved for summary judgment as to those perceived (but non-existent) claims.[85]

In the course of resolving these motions, the court will also reach and discuss FHS's claims for rescission and reformation of the agreement, both of which are the subject of summary judgment motions filed by Progress Center.

PART THREE

*Discussion of the Contract Claims*

A *prima facie* case for breach of contract under Alabama law is established

---

[83] *See* doc. no. 65, Ex. J, p. 98, lines 17-21.

[84] *See* doc. no. 75, p. 14 n.18.

[85] *See* doc. no. 71 (Third-Party Defendants Marcus & Millichap's and John Wise's Joint Memorandum in Support of Summary Judgment), p. 8

when a plaintiff demonstrates:  (1) the existence of a valid contract binding the parties in the action; (2) performance of plaintiff's obligations under the contract; (3) defendant's failure to perform; and (4) resulting damage to the plaintiff.  *See, e.g., Employees' Benefit Association v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998).  *See generally* 1 *Alabama Pattern Jury Instructions - Civil* § 10.12, at 177 (2d ed. 1993).

> It is the duty of the court to analyze and determine the meaning of a contract when its terms are clear and certain, but when the terms of the contract are doubtful of meaning or the language is ambiguous, precontract negotiations and the conduct of the parties may be looked at by the jury as an aid in interpreting the contract.

*Underwood v. South Central Bell Telephone Co.*, 590 So. 2d 170, 175 (Ala. 1991).

Thus, summary judgment is appropriate on a breach of contract claim if the terms of the agreement are fundamentally definite, and mandate the entry of judgment as a matter of law in favor of the moving party.  *See McDonald v. U.S. Die Casting & Development Co.*, 585 So. 2d 853, 855 (Ala. 1991).  Failing that level of transparency, the motion must be denied, and the case placed before a trier of fact.

## A.    FHS's Breach of Contract Claim Against Progress Center

The facts of FHS's breach of contract claims fall within the category of situations in which the court can unilaterally determine the rights and liabilities of the parties.  FHS's principal theory of contractual liability against Progress Center rests on the notion that the purchase agreement entitled FHS to directly communicate with

agents of GSA.[86]  As counsel for Progress Center points out, however, no reasonable construction of the contract supports this allegation.   The two relevant provisions both specify that FHS shall have "access to the *Property*."[87]   A plain reading of these clauses suggests that the parties intended only to ensure FHS's right to *physical inspection* of the property.  *See Young v. Pimperl*, 882 So. 2d 828, 831 (Ala. 2003) ("Where there is no indication that the terms of a contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning"); *Bowdoin Square*, *LLC v. Winn-Dixie Montgomery*, *Inc.*, 873 So. 2d 1091, 1098 (Ala. 2003) (noting that, in determining whether any ambiguity sufficient to submit the case to a jury exists, the words of a contract must be read with reference to their commonly accepted meaning).

That is to say, the word "property" is not commonly understood to include "tenants" of the leasehold.   Indeed, Simens was asked pointedly about his understanding of the "access" clauses, and admitted that they unambiguously refer to "physical inspection of the property."[88]  As stated above, counsel for FHS has made no meaningful attempt to counter this construction.   Accordingly, the court sees no

---

[86] *See* doc. no. 77, Ex. C, p. 114, lines 13-20; *id*. at Ex. A, ¶ 6.

[87] *See* doc. no. 65, Ex. B, §§ 5(c), 13(b) (emphasis supplied).

[88] *Id*. at Ex. J, p. 69, lines 6-16.

basis for allowing this permutation of FHS's breach of contract claim against Progress Center to be submitted to a jury, *see McDonald*, 585 So. 2d at 855, and it will be dismissed.

Although it is extremely underdeveloped in the briefs, and even more abstract in the testimony itself, FHS's second theory of contractual liability against Progress Center appears to rest on the allegation that Progress Center failed to deliver to FHS "true, complete and correct copies of [the due diligence documents, and] any other agreements, communications and other documents that are material to the ownership, use or operation of the Property."[89]  At his deposition, Simens was interrogated *ad nauseam* about FHS's allegations, if any, in this regard.  He at first stated his *suspicions* that certain documents *might* have been withheld, but no concrete allegations ever came to light.[90]  Indeed, the best synopsis of the entire discussion is captured in three simple lines:

> Q.   Do you have any information to suggest that they [Progress Center] did not provide all of the due diligence documents?

---

[89] *Id*. at Ex. A, p. 12, § 9(l).  *See also id*. at Ex. J, p. 86, lines 3-23; doc. no. 75, p. 14.

[90] In its brief, FHS cites page 151 of Simens' deposition as evidentiary support for the allegation that "Progress Center failed to convey to FHS the information that GSA did not intend to renew its lease at a rate of $15.70."  Doc. no. 75, p. 14 & n.17.  The court notes that page 151 contains *no testimony whatsoever* even obliquely addressing this allegation.  More generally, the court has poured over each of the evidentiary submissions and has been unable to ascertain whether Simens even alleges that Progress Center actually possessed such information.

A.    No.  I do not.[91]

A few pages later, Simens went even further:

Q.    . . . . Is there any section of this agreement that you contend my
client [Progress Center] breached?

A.    No.[92]

In short, not only is there a dearth of evidence supporting the allegation that

Progress Center defaulted on some specific obligation under the purchase agreement,

there is categorical testimony from FHS's designated representative expressly

disavowing any claim of breach.  The court, therefore, can discern no genuine issue

as to any material fact relevant to either version of FHS's breach of contract claim

against Progress Center, and the latter party is clearly due judgment as a matter of

law.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

## B.    FHS's Breach of Contract Claim Against Marcus & Millichap and Wise

Similarly, insofar as Marcus & Millichap and Wise believe that a contract

claim has been asserted against them, their fears may be allayed by the court's

conclusion that FHS's third-party complaint states no such claim.  It is quite unclear

why these third-party defendants perceived any attempt to include them in FHS's

---

[91] Doc. no. 65, Ex. J, p. 86, lines 20-23.  *See also id*. at p. 89, lines 15-20 (responding "I'm
not aware of any" to the question of whether Progress Center withheld any specific documents).

[92] *Id*. at p. 98, lines 17-21.

contract counts.[93]   Never does FHS allege that Marcus & Milichap or Wise were

parties to the contract, and none of the prayers for relief in the contract counts name

them as targets.  Simens made clear that FHS does not purport to have entered into

any contractual agreement with either Marcus & Millichap or Wise.[94]   Finally,

counsel for FHS has again failed to respond to any argument in favor of summary

judgment on this issue and, thus, presumably concurs in the conclusion that no such

claim was intended.  In light of this decision, the motion for summary judgment filed

by Marcus & Millichap and Wise, to the extent that it seeks the entry of judgment in

their favor on these non-existent claims, is due to be denied as moot.

---

[93] *See generally* doc. no. 20, p. 9, ¶¶ 26-35 (discussing the circumstances surrounding the allegation that "*Progress Center* breached the agreement") (emphasis supplied).

[94] The relevant colloquy went as follows:

Q.      . . . Is there a written contract with John Wise or Marcus & Millichap of Atlanta, LLC?

A.      No.

        . . .

Q.      Do you contend that there are any verbal contracts you have with John Wise or Marcus & Millichap of Atlanta, LLC?

A.      No.

Doc. no. 70, Ex. A, p. 196, line 23 - p. 197, line 11.

C.     **FHS's Claim for Reformation of the Purchase Agreement**

Also included in FHS's assortment of claims is a count seeking reformation of the purchase agreement.  Specifically, FHS prays that the court will reform the stated purchase price to a lower amount, reflecting what FHS believes is the actual fair market value of the property.  Progress Center has sought summary judgment on this claim, and FHS has offered no response in opposition.  This is of no great moment, however, as the court sees no colorable basis for the extraordinary remedy of reformation.  Alabama law provides that:

> When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.

Ala. Code § 8-1-2 (1975) (2006 Replacement Vol.).  Critical to the applicability of this statutory provision, however, is the existence of an agreement which "does not truly express the intentions of the parties." *Id*.  But Simens admitted that the contract is a complete and accurate statement of the agreement struck by the parties:

Q.     Does this document contain all the terms and conditions under which FHS agreed to purchase the property?

A.     I assume that it does.

Q.     Are you aware of any that are not contained in this document?

-34-

A.     No.  I am not aware of it.[95]

Likewise, FHS does not claim any mistake or fraud as to the amount set as the purchase price in the contract.  *See* § 8-1-2.  FHS also does not claim any prior negotiations during which the parties agreed to complete a sale for "fair market value," as opposed to the price specified by the agreement.  *See*, *e.g.*, *Pearson v. Agricultural Insurance Co. of Watertown, New York*, 25 So. 2d 164, 166 (Ala. 1946) (reciting the settled rule that a reformation must be based upon a prior agreement which the contract does not express).

Although there are multiple allegations of fraudulent misrepresentations before the court, FHS has not presented any evidence of fraud or mistake as to the *actual content of the contract*.  In fact, each alleged misrepresentation occurred *subsequent to* the contract's execution, and the only claim is that these statements induced FHS to allow the contract to "go hard," as opposed to executing the agreement in the first instance.  *See Boyett v. Oakes*, 518 So. 2d 37, 39 (Ala. 1987) (holding reformation improper where plaintiff made no argument that a release did not state the true intentions of the parties, asserting instead that defendant fraudulently procured the release through his misrepresentations).

In short, the court finds no justification for reformation on these facts.

---

[95] Doc. no. 65, Ex. J, p. 66, lines 10-16.

Therefore, Progress Center's motion for summary judgment as to FHS's reformation claim is due to be granted.

## D.    Progress Center's Breach of Contract Claim Against FHS

Setting aside these less contested issues, there remains Progress Center's breach of contract claim against FHS, and accompanying request for a declaratory judgment.  Progress Center asserts that FHS breached the purchase agreement by

> failing to proceed with the closing of the real estate transaction . . . [,] unilaterally terminating the Agreement after the expiration of the Due Diligence Period[,] and/or refusing to allow the [First American] Title Company to release the Deposit to Progress Center in accordance with the Agreement.[96]

Based on the alleged breach, Progress Center demands the aggregate sum of the two deposits currently held in the Clerk's registry, plus accumulated interest, attorneys' fees, and costs, in accordance with the terms of the purchase agreement.[97]  According to Progress Center, "FHS admitted each and every element necessary for Progress Center to recover on its claim for breach of contract."[98]

The Supreme Court of Alabama has said that "[a] material breach [of contract]

---

[96] Doc. no. 29, p. 4, ¶ 13.  *See also* doc. no. 64, p. 14.

[97] *See* doc. no. 65, Ex. B, § 19(d) (providing for recovery of costs and attorneys' fees by a prevailing party in any dispute under the purchase agreement); *id*. at § 14(a) (providing for liquidated damages in the amount of $200,000 as the seller's "sole and exclusive remedy" in the event of a breach of the agreement by the purchaser).

[98] Doc. no. 64, p. 15.

is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." *Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1248 (Ala. 1988). It almost goes without saying that FHS's failure to proceed with the closing of the sale after allowing the purchase agreement to ripen ("harden") into a binding contract meets the standard of material breach, and undoubtedly caused some measure of damage to Progress Center. *See Grissett*, 732 So. 2d at 975 (discussing the elements of breach). Moreover, Simens' testimony, outlined above, confirms that Progress Center performed all of its contractual obligations. *See id*. Therefore, absent any additional considerations, the court would be well within its powers to declare that the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 251-52 (1986).

FHS argues, nevertheless, that even though it did not adhere to the terms of the purchase agreement, its allegations of misrepresentations give rise to a ground for avoidance of the contract. FHS maintains it is entitled to rescission because

> a seller's misrepresentation of a material fact which acts as an inducement to purchase and upon which the purchaser reasonably relies constitutes fraud and establishes a ground on which the purchaser may avoid the contract.

*Saranthus v. McIntyre*, 557 So.2d 1275, 1276 (Ala. Civ. App. 1989) (internal citations omitted). *See also Johnson v. Jagermoore-Estes Properties*, 456 So. 2d

1072, 1075 (Ala. 1984) (noting that "a material falsehood constituting fraud may justify rescission").

The court agrees that, if sufficient evidence exists, FHS could resist the entry of summary judgment through a defense of fraudulent inducement. Nevertheless, as discussed below, FHS has failed to put forth sufficient evidence as to several essential elements of its case to create a *genuine* issue of *material* fact. The allegations of misrepresentations being no barrier, Progress Center's motions for summary judgment as to its breach of contract claim, and concomitant request for a declaratory judgment, are due to be granted.

## PART FOUR

### *Discussion of Inconsistencies in the Allegations of Fraud*

Before reaching the merits of the fraud claims, the court must confront and dispose of a procedural matter. Luther and Progress Center have attempted to narrow the evidence upon which FHS can rely by arguing that FHS failed to give them fair notice of certain representations which FHS now claims to have constituted fraud. The debate centers on one paragraph of FHS's Amended Answer, Counterclaims, and Third-Party Complaint, which alleges, in its entirety, that:

> During the Due Diligence Period, Max Agrippa Luther ("Luther") of Progress Center told Mark Simes [*sic*] of FHS that GSA intended to *renew* its lease *and* had *agreed* to do so at the rate of $15.70 per square

-38-

foot.  This information was vital to FHS's efforts to purchase the Property.[99]

During the course of discovery, it became apparent that these two sentences did not accurately communicate FHS's accusations against Luther.  Simens testified that no allegation concerning a possible "renewal" of GSA's existing lease in 2007 was intended.[100]    Rather, the gravamen of FHS's complaint was an alleged misrepresentation concerning GSA's intent to increase the size of its leasehold by expanding into the so-called "Krause space" at the termination of the Krause lease in September 2004.[101]

In addition to this arguable refinement of FHS's stated claim, Simens actually introduced allegations of yet another, distinct claim against Luther and Progress

---

[99] Doc. no. 20, p. 5, ¶ 8 (emphasis supplied).

[100] *See* doc. no. 68, Ex. J, p. 163, line 23 - p. 164, line 3.

[101] *See generally* doc. no. 65,  Ex. J, p. 159.  The court notes that Simens did subsequently submit an affidavit that includes the precise allegation which he explicitly disavowed in his deposition.  The relevant paragraph reads:

> During the inspection period, Gripp Luther told FHS that GSA *intended to renew its existing lease*, and that it intended to extend its lease to include the Krause space, at a lease rate of $15.70 per square foot.

Doc. no. 77, Ex. A (Simens Affidavit), ¶ 7 (emphasis supplied).  The court attaches no weight to this affidavit, however, recognizing that "[w]hen a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Clay v. Equifax, Inc.*, 762 F.2d 952, 955 n.3 (11th Cir. 1985) (internal citations and quotations omitted).  *See also McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (same).

Center — a claim that was not even remotely referenced in FHS's Answer, Counterclaims, or Third-Party Complaint.    According to Simens, Luther misrepresented the market rental value of the space at Progress Center No. 7.[102]  In their briefs, Progress Center and Luther have argued that the evidence supporting this assertion is not properly before the court on summary judgment, given FHS's failure to amend its pleading to reflect the evidence uncovered during discovery.[103]  The court tends to agree, at least in part.

The obvious starting point for the court's analysis is Federal Rule of Civil Procedure 9(b),[104] which  modifies the "notice pleading" doctrine embodied in Rule 8(a),[105] and requires significantly more precision when alleging fraud.  Although "Rule 9(b) must not be read to abrogate Rule 8(a)," *Friedlander v. Nims*, 755 F.2d

---

[102] *See* doc. no. 77, Ex. C,  p. 144, lines 10-17.

[103] As of the entry of the court's Amended Scheduling Order (doc. no. 46), dated December 10, 2004, the time for amendments has passed.  FHS has not moved to amend under Fed. R. Civ. P. 15(a) at any point subsequent to entry of that order.

[104] Fed. R. Civ. P. 9(b) provides, in pertinent part:  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. . . ." *Id*.

[105] Fed. R. Civ. P. 8(a) provides, in pertinent part:

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. . . .

*Id*.  *See also* Fed. R. Civ. P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct. . . .").

810, 813 (11th Cir. 1985), neither should it be understood as a mere restatement of the notice pleading rules.  As another judge of this court recently observed,

> [t]he requirements of Rule 9(b) are met [only] where the plaintiff sets forth:  (1) *the content of the precise statement* or omission; (2) *who* made, or failed to make, the statement; (3) *where* the statement was, or should have been, made; (4) *when* the statement was, or should have been, made; and (5) what the defendants gained as a consequence.

*S.E.C. v. Scrushy*, Case No. CV-03-J-615-S, 2005 WL3279894, at * 2 (N.D. Ala. Nov. 29, 2005) (emphasis supplied).  *See also Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (same).

## A.    Simens' New Allegation that Luther Misrepresented Market Value

Whatever the level of specificity required to pass Rule 9(b) muster, FHS's total failure to even *mention* in its amended pleading the existence of *additional* misrepresentations allegedly made by Luther falls far short.  *See Ziemba*, 256 F.3d at 1202 (demanding at least information as to "precisely what statements were made . . . and the content of such statements").  This conclusion is bolstered by the fact that FHS *did* include arguable references to representations of market rental value in both of the paragraphs describing its allegations against Marcus & Millichap and Wise, but not in the one respecting Luther.[106]

---

[106] *See* doc. no. 20, p. 5, ¶¶ 10, 12 (averring that Marcus & Millichap and Wise represented that "the Property would appraise at the purchase price").

This court acknowledges that there is some authority holding that, when weighing evidence at the summary judgment stage, "the court *may* evaluate the pleadings both in terms of their content at the time of their submission *and as they might be amended at some later date*."  10A *Wright, Miller & Kane* § 2722, p. 369 (3d ed. 1998 & Supp. 2005) (emphasis supplied).  The use of the permissible verb "may" in the preceding quotation, as opposed to the mandatory injunctions "shall" or "must," is significant.  Nevertheless, some courts have recognized extraordinary circumstances in which such treatment was deemed appropriate.  *See Sherman v. Hallbauer*, 455 F.2d 1236, 1237 (5th Cir. 1972); *Fulmer v. United States*, 83 F. Supp. 137, 150 (N.D. Ala. 1949).  Even so, the present situation is distinguishable.  First, neither the *Sherman* nor *Fulmer* decisions addressed allegations of fraud, which trigger the specificity requirements of Rule 9(b).  Second, unlike both *Sherman* and *Fulmer*, in which the attorneys included new *legal theories* in their summary judgment briefs, the amendment that FHS should have filed would have supplemented its *factual allegations*.  Third, these new representations are not FHS's only legally cognizable theory of recovery, as they were in *Sherman*.  In fact, in its briefs opposing Progress Center's and Luther's motions for summary judgment, FHS enumerated two *other* alleged misrepresentations, each of which would be actionable

if proved.[107]  For all of these reasons, FHS may not rely on the newly disclosed allegation that Luther misrepresented market rental value in resisting either Luther's or Progress Center's motion for summary judgment.

**B.    Simens' Substitution of "Expansion" for "Renewal"**

On the other hand, Simens' clarification of the confusion arising from FHS's attorney's use of the word "renewal," as opposed to "expansion," when drafting FHS's Amended Answer, Counterclaims and Third-Party Claims is a less serious matter. True, the attorney for FHS could have exercised more care in fleshing out his client's allegations, but the complaint is sufficiently specific to place the defending parties on notice of the nature of the claim.  *See Zuckerman v. Franz*, 573 F. Supp. 351, 355 (S.D. Fla. 1983) (evaluating sufficiency with reference to whether the complaint gave "defendants fair notice of the nature of plaintiff's claim and the grounds upon which it is based").  The paragraph stating the allegations against Luther, and almost every surrounding paragraph, refers to the issue of GSA's potential "renewal" of its lease "at the rate of $15.70 per square foot."[108]  Luther and Progress Center might have initially questioned whether this referred to the space occupied by GSA in early 2004, or that existing leasehold *plus* the so-called Krause space into which GSA allegedly

---

[107] *See* doc. no. 73, p. 9; doc. no. 75, p. 11.

[108] Doc. no. 20, p. 5, ¶ 8.

considering expanding.  Still, the bare allusion to the negotiations over the GSA lease should have triggered recollection of the issues involved.  Indeed, Luther testified in detail at his deposition concerning the circumstances surrounding GSA's proposed expansion without any noticeable handicap.[109]  Therefore, the court will consider the testimony on Luther's alleged misrepresentations as to GSA's intent to expand into the so-called Krause space when weighing the evidence.

## PART FIVE

### *Discussion of the Fraud Claims*

In order to establish a *prima facie* case of fraudulent misrepresentation under Alabama law, FHS must demonstrate:  "(1) a false representation; (2) concerning a material existing fact; (3) which is relied upon by the plaintiff; and, (4) damage to the plaintiff as a proximate result of the false representation."  *Dickinson v. Moore*, 468 So. 2d 136, 137-38 (Ala. 1985); *see also Nesbitt v. Frederick*, Case No. 1040060, 2006 WL 1195872, at *5 (Ala. May 5, 2006).  In addition, a plaintiff must show that his reliance upon the alleged false representation was reasonable.  *See Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997). "[R]eliance is reasonable in the absence of independent knowledge sufficient to arouse the purchaser's suspicion, and he is not obligated to make an independent investigation as to the truth

---

[109] Doc. no. 77, Ex. D, p. 285, line 21 - p. 287, line 18.

of the seller's representations absent such knowledge." *Saranthus v. McIntyre*, 557 So. 2d 1275, 1276 (Ala. Civ. App. 1989) (internal citations omitted).

In most cases, the representation forming the basis of a fraud claim need not have been made with a specific intent to defraud, because Alabama law provides that "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, *or if made by mistake and innocently and acted on by the opposite party*, constitute legal fraud." Ala. Code § 6-5-101 (1975) (2006 Replacement Vol.) (emphasis supplied). Thus, "Alabama also allows a plaintiff to sue for an innocent misrepresentation — any false statement made by defendant upon which plaintiff [reasonably] relied to its detriment." *Henig Furs, Inc. v. J.C. Penney Co.*, 811 F. Supp. 1546, 1549 n.2 (M.D. Ala. 1993) (citing § 6-5-101).

There is, nevertheless, one relevant situation in which proof of a specific intent to defraud is required: *i.e.*, a fraud claim predicated on a statement of *opinion* justifies recovery *only* "if there is proof of actual fraudulent intent at the time the representation is made and the person succeeds in the deception and injury results. . . ." *Reynolds v. Mitchell*, 529 So. 2d 227, 231 (Ala. 1988). *See also*, *e.g.*, *George v. Federal Land Bank of Jackson*, 501 So. 2d 432, 435 (Ala. 1986). Under a long line of Alabama cases, a person's statements concerning the *value* of property and

"appraisals are considered statements of opinion, rather than statements of fact."
*Brushwitz v. Ezell*, 757 So. 2d 423, 432 (Ala. 2000). *See also Kaye v. Pawnee
Construction Co.*, 680 F.2d 1360, 1368 (11th Cir. 1982) (collecting cases). "Whether
a fraudulent intent has been proven is a matter peculiarly within the province of the
jury, *where there is evidence of such an intent.*" *Reynolds*, 529 So. 2d at 231
(emphasis supplied). *See also National Security Insurance Co. v. Donaldson*, 664 So.
2d 871, 876 (Ala. 1995) (same).

## A.     Luther's Representations of GSA's Intended Expansion

Ignoring Luther's alleged misrepresentations of market rental value,[110] FHS's
sole remaining claim against Luther (which is derivatively applicable against Progress
Center) is that he misrepresented GSA's intent to increase the amount of its leased
space by taking over the Krause space at $15.70 a square foot.  FHS argues that,
because Luther allegedly made statements concerning GSA's *then-existing intent*,
rather than his *opinion* as to GSA's *future* intentions, or possible *future* actions, a
mere innocent misrepresentation will suffice to permit recovery under Alabama Code
§ 6-5-101.  *See Henig Furs*, 811 F. Supp. at 1549 n.2.  The court is not convinced that
Luther's representations can be categorized as statements of fact: they appear much

---

[110] *See* Part IV *supra*, concluding that any evidence of representations by Luther as to market
rental value will not suffice to avoid summary judgment, because no such allegations were included
in FHS's pleadings.

more like predictions of events that may occur in the future.  This is significant because, while false statements of fact are actionable under a fraudulent misrepresentation theory, statements of events to be accomplished in the future are arguably grounds for a cause of action sounding in promissory fraud — assuming that "when the representation was made, the defendant intended not to perform in accordance with it."  *See*, *e.g.*, *Executive Development*, *Inc. v. Smith*, 557 So. 2d 1231, 1233 (Ala. 1990) (internal quotations and citations omitted); *see also Auto-Owners Insurance. Co. v. Abston*, 822 So. 2d 1187, 1196 n.10 (Ala. 2001).  In either case, of course, FHS has the burden of producing some evidence which, when viewed in the light most favorable to FHS, could support each and every element of its claim.  *Id*. at 1549 n.4.

First, of course FHS must establish that a representation as to a material existing fact or event to occur in the future was actually made.  *Roney v. Ray*, 436 So. 2d 875, 877 (Ala. 1983).  Luther's testimony initially appears promising for FHS in this regard:

> Q.   And of what interest would the GSA expansion [into the space then occupied by the Johann Krause company] have been to . . . Mark Simens?
>
> A.   I had told all the parties that you just named that *it was my understanding that GSA wanted to expand into the Krause space*, that Krause wished – wanted to stay, but that I was going to let

Krause go to make room for our primary tenant, GSA, to expand.

Q.      When you discussed this potential Krause expansion with these folks, did you discuss the leasing rate for the space?

        . . .

A.      I believe I told them that I would forecast or predict a rate that would be similar to what they were currently paying [$15.70 per square foot].[111]

The issue becomes less clear, however, when one considers Simens' testimony:

There was never any affirmation on [Luther's] part about extending both leases.  He said, 'I will try.'  But *there was not any guarantee or anything else about the extension*.[112]

Put in this light, Luther's statements begin to look less like a representation of an existing material fact, *see Roney*, 436 So. 2d at 877, and more like a statement of what he hoped to accomplish in the future.  As stated above, this distinction is crucial, due to the requirement of a present intent to defraud with claims of promissory fraud. *See*, *e.g.*, *Smith*, 557 So. 2d at 1233; *see also Abston*, 822 So. 2d at 1196 n.10.  Of course, FHS's complaint obviously states no claim for promissory fraud,[113] and it is not entirely clear whether FHS has sufficient evidence of existing intent to support such a claim.   *See*, *e.g.*, *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 847 (Ala.

---

[111] Doc. no. 77, Ex. D, p. 286, line 1- line 23 (emphasis supplied).

[112] Doc. no. 65, Ex. J, p. 158, lines 13-16 (emphasis supplied).

[113] *See* doc. no. 20.

1993) (finding no evidence of fraudulent intent, notwithstanding the existence of a clear financial motive to misrepresent).

But even if Luther's statement could be construed as a representation of an existing fact, FHS's case has other deficiencies.  To prevail at this stage, FHS must produce sufficient evidence to allow a reasonable jury to conclude that Luther's representations as to GSA's intentions were *false*.  *Dickinson*, 468 So. 2d at 137-38. This is a difficult hurdle to clear, given Simens' testimony on the issue:

> Q.   Do you have anything to suggest that . . . neither GSA nor Krause wanted the space, that [Luther's representations as to GSA's desire to expand into the Krause space] was false?
>
> A.   No.[114]

Ignoring Simens' somewhat crushing concession, FHS attempts to point to another piece of evidence:  an email, originally sent by a GSA representative to Luther on April 28, 2004, "regarding the *expansion request from DAU* [*i.e.*, the Defense Acquisitions University, a GSA tenant in] *in Building 7*."[115]  According to counsel for FHS, this email "reveals that GSA had never agreed to expand its lease [,] and had never agreed to its lease at a rate of $15.70 per square foot,"[116] because it states that

---

[114] Doc. no. 65, Ex. J, p. 163, lines 16-19.

[115] Doc. no. 76, Ex. I, p. 2 (emphasis supplied).

[116] Doc. no. 73, p. 11.

-49-

"[y]ou have proposed the current rent rate [$15.70] for the extended lease term and we are not interested in this."[117]   Conversely, to Luther and Progress Center, the email proves that "GSA specifically *requested* expansion of its lease space," and, further, establishes that Luther, in fact, *attempted* to negotiate an expansion.[118]

Assuming for the sake of argument that this hearsay document is properly before the court,[119] the email itself still does not establish the existence of a genuine issue of material fact that would preclude summary judgment as to this claim.  The fact that the email establishes GSA never *agreed* to expand its leased space is irrelevant, because Simens offered absolutely no testimony tending to establish the existence of any such representation in the first instance.[120]   Simens stated only that Luther represented GSA's *desire* to expand its lease, but "there was not any guarantee" that it would do so.[121]   Therefore, the only relevant proof is Simens' own confession that FHS lacks any evidence to support an essential element of its cause

---

[117] Doc. no. 76, Ex. I, p. 2.

[118] Doc. no. 80 (Plaintiff Progress Center's Reply Brief in Support of Summary Judgment) (referring to the fact that the opening sentence stated that the email was "regarding the *expansion request from* DAU").

[119] *See Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1015 (11th Cir. 1987) (holding that a letter, although hearsay, should have been considered at summary judgment to the extent that it indicated the existence of any disputed material facts).

[120] Doc. no. 65, Ex. J, p. 158, lines 13-16.

[121] *Id.*

-50-

of action: *i.e.*, the falsity of Luther's representation. *See Abston*, 822 So. 2d at 1197 (discussing the necessity of proving falsity). This is plainly insufficient to create a genuine issue of fact for jury determination, and thus judgment on this aspect of the fraud claim must be entered in favor of Progress Center and Luther. *Cf. Lewis v. Casey*, 518 U.S. 343, 358 (1996).

**B.     Wise's Representations of Market Rental Value**

Notwithstanding the court's decision to forego discussion of the newly developed allegations of market rental value misrepresentations by Luther,[122] there remains the claim that both Camak and Wise engaged in similar misconduct. The court has no problem quickly disposing of the claims against Wise, based almost exclusively on Simens' own testimony. At his deposition, Simens was questioned extensively about Wise's role in the alleged fraud. To ensure completeness, the court sets out the entirety of the dialogue:

> Q.     ... Concerning the misrepresentations you contend — we'll take them both one at a time — John Wise made to you.
>
> A.     He represented the market rate was $15.70 a foot.
>
> Q.     When did he do that?
>
> A.     In the car. He was the driver of the car.

---

[122] *See* Part IV *supra*.

Q.      And . . . that's the same car ride you've discussed —

A.      Yes.

Q.      — Previously on February 18 or February —

A.      Whenever it was; yes.

Q.      Previously, you had stated that Gripp Luther made that representation.  Are you telling me that both Gripp and John Wise made the same representation?

A.      Yes.

Q.      Okay.  So John Wise said it separately from Gripp Luther?

A.      That's correct.

Q.      Tell me how that conversation went.  Tell me what you said to prompt it, what he said to respond to it to the best of your recollection, what —

A.      To the best of my recollection was [*sic*] we were on a tour of the Huntsville area.  We drove by numerous properties, and it was in the context of, Okay; this property, is this — this is deficient to the property at Progress 7, you know, so the rents would be lower here, versus, you know, property here.

Q.      Okay.  Okay.  *Well, did he ever say that rents at Progress 7 are market rents?*

A.      *I don't recall.*

Q.      Okay.  So your recollection sitting here today is that John Wise pointed out various office spaces, or, or rental spaces, and said the rents here would be different than Progress 7 because this building is deficient in whatever way?

-52-

A.    That's correct.

Q.    Anything else?

A.    Not to my knowledge.

Q.    Okay.  So you don't recall him ever saying — making a representation regarding Progress 7?

A.    I remember him represent — *not a representation.  It's basically a comparison to others in the market, other properties in the market.*

Q.    Did he ever point out a building to you that was getting — that he contended the rent rates were $15.00?

A.    I don't recall.

Q.    Did he ever point out a building that he contended the rent rates were higher than $15.00?

A.    I recall — no; I don't recall that.  But I recall rent rates being lower.

Q.    Okay.  So your memory here today is that the — the spaces that John Wise pointed out to you were spaces that had lower rent rates than Progress 7?

A.    No.  What I'm saying is that's all I recall him pointing out.  That doesn't necessarily mean . . . there weren't ones higher.  I just don't remember that.

       . . .

Q.    Is there anything else John Wise said during this car ride that you contend is a misrepresentation as alleged in this lawsuit?

-53-

A.      No.

Q.      Okay.  Outside of the car ride — we're still on John Wise — is there anything else that you contend was a misrepresentation made by him as alleged in this lawsuit?

A.      Not that I can recall at this time.[123]

As this testimony makes clear, Wise is not so much accused of misrepresenting the market rental value of Progress Center No. 7 as he is accused of misrepresenting the market rental value of *other buildings* in the vicinity of Progress Center No. 7. These allegations may be true.  On a motion for summary judgment, the court is bound to assume (within reason) that they are.  *See Brosseau v. Haugen*, 534 U.S. 194, 195 n.2 (2004).  But a claim of fraud is not one on which a plaintiff may prevail merely on the basis of generalized statements of the defendant's misconduct.  There must be some proof of the *falsity* of the claimed representation.  *See Abston*, 822 So. 2d at 1197.  The fact of the matter, though, is that the court has been presented with absolutely no evidence indicating *which* buildings Wise allegedly characterized as inferior to Progress Center No. 7.  Equally as important, FHS has failed to include in its evidentiary submissions any testimony establishing the *true* rental value of these other commercial complexes.  Without such evidence of falsity, a claim of misrepresentation must fail.  *See id*.

---

[123] Doc. no. 70, p. 200, line 1 - p. 203, line 1 (emphasis supplied).

-54-

Additionally, in the case of an opinion statement, as here, there must be substantial evidence indicating actual intent to defraud. *See, e.g.*, *Brushwitz*, 757 So. 2d at 432; *Reynolds*, 529 So. 2d at 231; *Tillis v. Smith Sons Labor Co.*, 65 So. 1015, 1018 (Ala. 1914) (citing "opinions as to current market value" as the "most common example" of misrepresentations which are not actionable absent evidence of fraudulent intent). The only theory FHS has proffered in support of Wise's supposed intent to deceive is that Marcus & Millichap stood to gain half of the FHS's earnest money in the event of a default.[124] But notwithstanding his attorneys' arguments, Simens himself expressly refuses to rely on any claim that Wise was motivated to make the alleged misrepresentations by the prospect of an easy profit:

> Q.    So had the sale of the property gone through, they [Marcus & Millichap] would have gotten whatever commission they would have gotten. But you — you believe they may have been motivated to . . . [m]ilk you out of your deposit. And then is that — do you think they were motivated to do that?
>
> A.    No.
>
> Q.    Well, tell me what you — what your contention is in that regard.
>
> A.    I believe that they made a representation of the market rent that ended up being not factual. The deal cratered because it was based on those — on representations of what we believed that the market rent was, my point being that Marcus & Millichap, regardless of what happened on this transaction would get half of

---

[124] *See* doc. no. 82, pp. 12-13.

> the deposit, or — and a commission on another deal, or if this deal closed, they would get the commission.
>
> . . .
>
> Q.    . . . Do you believe that those statement[s] you contend [Wise] made [about the market rental rate of various buildings in the vicinity of Progress Center No. 7], that when he made them, he knew them to be false?
>
> A.    No.  I don't know if he knew them to be false or not.
>
> Q.    You don't have any evidence of that?
>
> A.    No.[125]

Interestingly, however, even if Simens' testimony *had* supported this theory of intent, the cases suggest that such testimony would still be insufficient as a matter of law. There are several Alabama cases granting summary judgment based on insufficient evidence of fraudulent intent, even though the alleged perpetrators had an apparent financial incentive to  misrepresent.  *See*, *e.g.*, *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 847 (Ala. 1993) (finding "no substantial evidence in the record of a present intent by the defendants to deceive McGowan at the time he bought the car" that was the subject of the alleged misrepresentations, notwithstanding the fact that one of the persons who made the statements was the salesman himself).  In light of the failures of proof — both as to evidence of intent to deceive, and as to evidence of falsity —

---

[125] Doc. no. 83, Ex. C, p. 207, line 10 - p. 209, line 2.

the court is constrained to hold that summary judgment on this claim must be entered in favor of Progress Center, Marcus & Millichap, and Wise.

## C.   Camak's Representations of Market Rental Value

Similar evidentiary shortcomings plague FHS's claim that Camak misrepresented Progress Center No. 7's market rental value.  In alleging that Camak misled Simens, FHS seizes on the email sent by Camak to Simens in January of 2004. As recounted above, Camak wrote:

> $15.00 is right at the market rent rate for a full service lease in that area. That's from the Huntsville Chamber from their information.  We think it might be outdated just a tad, but it's close.[126]

Applicable here again is the rule that representations of market value are considered under Alabama law to be statements of opinion, requiring proof of actual intent to deceive.  *See*, *e.g.*, *Cooper & Co. v. Lester*, 832 So. 2d 628, 633 (Ala. 2000); *Brushwitz*, 757 So. 2d at 432; *Reynolds*, 529 So. 2d at 231; *Tillis*, 65 So. at 1018. Simens, however, refused to state whether he believed that Camak was attempting to intentionally deceive:

> Q.     . . . Do you believe that [Camak] was lying about checking with the Chamber of Commerce?
>
> A.     I don't know one way or the other.

---

[126] Doc. no. 70, Ex. H, ¶ 2 (boldface emphasis deleted).

Q.     Do you have any reason to disbelieve that?

A.     No.

Q.     Do you believe that he was lying about what they told him?

A.     No.  In fact, we believed it to be true, and we relied on it.

Q.     Well, sitting here today, do you believe that or have any reason to believe that the Chamber of Commerce told him something different than what he told you?

       [Objection]

A.     I don't know what they told him.[127]

This sort of ambivalent testimony is surely not sufficient to convince a reasonable jury that Camak *deliberately* foisted upon Simens inaccurate information for the purpose of inducing FHS to proceed with the transaction.  And, standing on its own, FHS's argument that money was the motive is no more effective under Alabama law here, than it was with respect to Wise.  *See McGowan*, 631 So. 2d at 847.

       Simens also closes the door on another crucial component of FHS's case when he admits that FHS has no records from the Huntsville Chamber of Commerce substantiating or contradicting Camak's representation.[128]   No other submissions

---

[127] Doc. no. 83, Ex. C, p. 209, lines 3-22.

[128] Simens testified as follows:

Q.     . . . [Y]ou don't have any evidence that the Chamber of Commerce told [Camak] something different than he told you?

-58-

indicate whether the Chamber of Commerce information was actually different from what Camak relayed to Simens, either.  Yet without such evidence, there can be no genuine factual dispute as to whether the representation was false, and thus, nothing to preclude the entry of summary judgment in the movants' favor.  *See Abston*, 822 So. 2d at 1197; *Reynolds*, 529 So.2d at 231.

But there is another, much more compelling, reason for refusing to allow FHS's claims of misrepresentations by Camak to proceed further.  Six years ago, the Alabama Supreme Court handed down a decision in the case of *Fisher v. Comer Plantation*, *Inc.*, 772 So. 2d 455 (Ala. 2000), that drew on earlier cases to hold that "those who are only conduits through which faulty information is supplied by one person to a third person cannot be held liable for fraud unless they acted in bad faith." *Id*. at 463 (citing *Speigner v. Howard*, 502 So. 2d 367 (Ala. 1987)).

The facts of *Fisher* are very similar to those involved in the present case.  The plaintiff in that case, Harry Fisher, developed an interest in a certain piece of land in Barbour County, Alabama, and contacted the company that owned the tract, Locators.

---

A.      I have no —

[Objection]

A.      — evidence of anything they told him one way or the other.

*Id*. at p. 210, lines 1-7.

-59-

*Fisher*, 772 So. 2d at 458.  Locators referred Fisher to its agent, Tim Speaks.  *Id*.  In the course of negotiating with Fisher, Speaks provided an appraisal of the property, prepared by a third-party, which listed its value at $919,000.  *Id*. at 459.  Responding to Fisher's inquiries as to certain aspects of the appraisal, Speaks represented that the figure was in fact accurate, and even suggested to Fisher the amount of money he thought Fisher should offer.  *Id*.  Fisher relied on this appraisal and Speaks' representations when executing a contract to purchase the land, but subsequently discovered that there were mathematical errors in the appraisal that caused it to project a value of the property that was nearly $100,000 higher than the true worth of the property.  *Id*. at 460.  Fisher then filed suit against both Speaks and Locators as Speaks' employer, seeking damages on the theory that Speaks had fraudulently misrepresented the value of the property through the appraisal.  *Id*. at 463.

The Alabama Supreme Court held that it could "find no evidence in the record indicating that Speaks [or] Locators . . . acted in bad faith.  Therefore, under the authority of *Speigner*, [it] conclude[d] that the trial court correctly entered the summary judgment as to Fisher's claims against Speaks . . . because [he] was a conduit[] passing information supplied by [the appraiser]."  *Id*. at 464.  Similarly, the Court upheld the entry of summary judgment in favor of Locators, since the theory of its liability was derivative only.  *Id*.

The court can find no meaningful distinction between FHS's case — insofar as it is predicated on the alleged misrepresentations by Camak — and *Fisher*. The justices deciding *Fisher* did not explicitly define what constitutes "bad faith," but given the striking factual similarities, it seems clear that the result here should be no different than the one reached there.  Here, as in *Fisher*, a real estate agent, who presumably stood to gain financially, conveyed the information as to market value. In fact, in *Fisher*, the agent's certification of the accuracy of the appraisal was more direct than Camak's mere comment that the Chamber's information was "close." Having been presented with no other evidence as to Camak's bad faith, the court finds itself constrained by the holding in *Fisher* to conclude that no genuine issue of material fact precludes the entry of summary judgment against FHS.  *See Chapman*, 229 F.3d at 1023 (holding that "[a] genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor").

## Conclusion

In accordance with the above conclusions of law, the court finds that Luther's motion for summary judgment is due to be granted.  The motion of Marcus & Millichap and Wise is due to be granted, except to the extent that it seeks summary judgment on FHS's perceived, but non-existent, breach of contract claims.  As to

those claims, the motion is due to be denied as moot in light of the court's construction of the Amended Answer, Counterclaims, and Third-Party Complaint. Finally, Progress Center's motion for summary judgment is due to be granted in its entirety.  Since no variant of FHS's misrepresentation claims survives this opinion, FHS's claim for rescission of the contract is not viable.  The court further finds (and FHS does not appear to disagree) that the liquidated damages clause contained within the purchase agreement is reasonable and, thus, enforceable.  *See generally Camelot Music*, *Inc. v. Marx Realty & Improvement Co.*, 514 So. 2d 987, 990 (Ala. 1987). Because FHS materially breached the agreement by failing to proceed to closing without any legally cognizable justification, Progress Center is entitled to the $200,000 deposit that is presently in the Clerk's registry.  Additionally, Progress Center has shown its contractual entitlement to costs and reasonable attorneys' fees. An appropriate order will be entered contemporaneously herewith.

DONE this 12th day of September, 2006.

United States District Judge